UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

Plaintiff,

vs.                                              REPORT AND RECOMMENDATION

Clinton James Donnell,

Defendant.          Crim. No. 08-199 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Clinton James

Donnell:

1.      The Defendant's Motion to Suppress Evidence
        Obtained Pursuant to Search and Seizure [Docket
        No. 26]; and

2.      The Defendant's Motion to Suppress Statements,
        Admissions, and Answers [Docket No. 27].

A Hearing on the Motions was conducted on July 14, 2008, at which time, the

Defendant appeared personally, and by Paul C. Engh, Esq., and the Government

appeared by Tricia A. Tingle, Assistant United States Attorney.   For reasons which follow, we recommend that each of the Defendant's Motions be denied.

## II.  Factual Background

The Defendant is charged with one (1) Count of Abusive Sexual Contact, in violation of Title 18 U.S.C. §§1151, 1153, 2244(a)(5), and 2246(3).   The events, which gave rise to that charge, are alleged to have taken place on or about May 20, 2008, in this State and District.  As pertinent to those charges, and to the Motions now before us, the operative facts may be briefly summarized.[1]

At the Hearing, Guadalupe Ybarra ("Ybarra"), who is a patrol officer with the Red Lake Department of Public Safety, and who responds to violent crimes on the Red Lake Indian Reservation, testified at the instance of the Government.   Ybarra testified that, on May 20, 2008, she began her patrol shift at approximately six (6)

---

[1] Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006).  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

o'clock a.m., and that, at approximately seven (7) o'clock a.m., she was dispatched

to the residence of Dave Downwind ("Downwind"), on the Red Lake Indian

Reservation.  According to Ybarra, Herman Donnell ("Herman") had called dispatch

to report that his son Justin Donnell ("Justin") was looking for his other son -- the

Defendant -- and that Justin had a knife.  While on her way to the Downwind

residence, Ybarra contacted the dispatcher for more information.  The dispatcher

advised Ybarra that Justin was searching for the Defendant because the Defendant had

sexually assaulted Justin's six-year-old daughter, C.D.[2]

---

[2]At the Hearing, the Government offered, without objection, and with the Defendant's stipulation as to its foundation, Exhibit 1, which is an audio recording of a 911 call by C.D.'s mother, at 7:24 o'clock a.m., on May 20, 2008, and which is evidently the second 911 call made by C.D.'s mother on that date.  Our review of the recording has disclosed that it is extremely difficult to understand many of the statements, which were made by C.D.'s mother, during the call.  However, C.D.'s mother informs the dispatcher that the Defendant "ran out of" her residence approximately one (1) hour earlier, and that, at that time, she found her daughter crying.  C.D.'s mother also informed the dispatcher that Justin left their residence at approximately 7:00 o'clock a.m., with a knife.  The dispatcher informed C.D.'s mother that officers were en route to her home, along with a Criminal Investigator, and she asked C.D.'s mother not to disturb any part of the scene.  On the recording, the dispatcher advises officers about what the "suspect," i.e., the Defendant, is wearing, as related by C.D.'s mother, and the dispatcher further advises the officers that C.D. is six (6) years old, and is in a lot of pain, also as related by C.D.'s mother.

Upon her arrival at the Downwind residence, Ybarra spoke with Herman, and with Downwind.[3]   Herman advised her that he had not yet located Justin, and Downwind informed Ybarra that the Defendant was inside his residence.   Ybarra attested that she asked Downwind for permission to enter his residence, in order to find the Defendant and, according to Ybarra, Downwind gave her verbal permission to do so.   Downwind also took a house key off of his key ring, handed it to Ybarra, and asked her to leave the key on his kitchen table, once she had entered the residence. On cross-examination, Ybarra testified that she did not advise Downwind that he could refuse to consent, nor did she inform him that she intended to arrest the Defendant.

Ybarra attested that she contacted the dispatcher, in order to advise that she and Officer Corbin House ("House") would be entering the Downwind residence in order to locate the Defendant.   Ybarra and House then unlocked the back door of the Residence, Ybarra left the house key on the kitchen table, and Ybarra and House proceeded to search the first floor, including the kitchen and the living room.   While conducting that search, Ybarra and House heard noises behind them, near the back

---

[3]Downwind is the father of the Defendant's girlfriend.   See, <u>Docket No. 26</u>, at 1; <u>Docket No. 31</u>, at 6 n. 1.

door.  Ybarra testified that she assumed the noises had come from the basement, as the officers had not yet searched that area.  Ybarra related that House ran toward the back door, and she followed him.  Ybarra then heard House ordering someone to stop and show his hands.

Upon reaching the back door, Ybarra saw House standing on the back steps, and the Defendant standing at the bottom of the steps, with his hands in the air. Ybarra ordered the Defendant to place his hands behind his back, and she attempted to place him in handcuffs.  At that point, the Defendant's girlfriend appeared, and interfered with the officers, which required House to pull the Defendant's girlfriend away, so that Ybarra could effect the Defendant's arrest.[4]  Ultimately, Ybarra was able to handcuff the Defendant, and she placed him in the back of her squad car.  On cross-examination, Ybarra testified that she made the decision to arrest him, based upon the information that she had earlier received from the dispatcher, about the Defendant's alleged assault on C.D.

---

[4]Ybarra testified that the Defendant's girlfriend was assaultive toward the officers, during her attempt to interfere with the Defendant's arrest, which eventually required Ybarra and House to use force, including the threatened use of a Taser, to subdue her.  Ybarra further testified that she smelled a strong odor of alcohol on both the Defendant and his girlfriend.  However, Ybarra testified that the Defendant was cooperative throughout his entire interaction with the officers.

Ybarra then drove the Defendant to the Red Lake Detention Center in her squad car, and she testified that no conversation took place during that transport.  Upon arrival at the Detention Center, Ybarra escorted the Defendant to the booking area, and read him a <u>Miranda</u> warning.  See, <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). According to Ybarra, the Defendant stated that he understood his rights, and that he wanted to speak with a lawyer.  Ybarra testified that she did not ask the Defendant any questions, once he asked for a lawyer.

Ybarra then informed Officer Smith ("Smith") that she needed the Defendant's clothes, and Smith escorted the Defendant to an area where he could change out of his clothes.  The Defendant then asked Smith, "Oh, what, am I going to get swabbed now?"  Ybarra testified that she did not hear the Defendant ask this question, and that she was informed of the Defendant's statement by Smith.  Ybarra also testified that she did not know, at that time, if the Defendant was aware of C.D.'s allegations against him.

III.  Discussion

A.   The Defendant's Motion to Suppress Evidence Obtained
     Pursuant to Search and Seizure.

The Defendant first challenges the lawfulness of his warrantless arrest, based upon his contention that it was not supported by probable cause.  The Defendant also contends that Downwind's consent to search was not knowing, and voluntary. We address the arguments in turn.

1.   The Constitutionality of the Defendant's Arrest.

a.   Standard of Review.  When a police officer has probable cause to believe that a person has committed a felony, a warrantless arrest is permitted.  See, United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993), citing United States v. Watson, 423 U.S. 411 (1976).  "Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000) ("Furthermore,

'[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting <u>Olinger v. Larson</u>, 134 F.3d 1362, 1366 (8th Cir. 1998); <u>Tokar v. Bowersox</u>, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense.").

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'"   <u>Tokar v. Bowersox</u>, supra at 1047, quoting <u>United States v. Everroad</u>, 704 F.2d 403, 406 (8th Cir. 1983).  We recognize, and accept, that an officer engaged in an arrest need not personally have found probable cause in order to lawfully effect the arrest.  As the Court explained, in <u>United States v. Gillette</u>, 245 F.3d 1032, 1034 (8th Cir. 2001), cert. denied, 534 U.S. 982 (2001):

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory, United States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000), to

- 8 -

> impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure.  Under this rationale, the validity of a search "may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if * * * some degree of communication exists between them," id.  See also United States v. Morales, 238 F.3d 952, 953 (8th Cir. 2001), and United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997).  The requirement that there be a degree of communication serves to distinguish between officers functioning as a "search team," United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989), and officers acting as independent actors who merely happen to be investigating the same subject.

We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."  Id.

A search incident to a valid arrest is constitutional.  See, e.g., New York v. Belton, 453 U.S. 454, 461 (1981); Chimel v. California, 395 U.S. 752, 762 (1969); United States v. Klein, 13 F.3d 1182, 1184 (8th Cir. 1994), cert. denied, 512 U.S. 1226 (1994).  "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."  Id., quoting United States v. Robinson, 414 U.S. 218, 235 (1973); see also, Curd v. City Court of Judsonia, Ark.,

141 F.3d 839, 842 (8th Cir. 1998)("Warrantless searches incident to a custodial arrest are 'justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.'"), quoting United States v. Edwards, 415 U.S. 800, 802-03 (1974).

       b.    Legal Analysis. Here, it is undisputed that the Defendant's arrest was warrantless, but that fact, alone, does not render the arrest unlawful, as long as there was probable cause to believe that he had committed a felony. The Defendant argues that Ybarra was initially dispatched to the Downwind residence in order to protect him from his brother, Justin, and not to arrest him for any alleged assault against C.D., and during her testimony, Ybarra acknowledged that her first assignment, when she was dispatched to the Downwind residence, was to keep the brothers apart.

However, Ybarra plainly testified that, prior to her arrest of the Defendant, she contacted the dispatcher, and learned that the Defendant was accused of sexually assaulting C.D. At that point, Ybarra made the independent decision to arrest the Defendant, based upon C.D.'s allegations, and we conclude that "the events leading up to the arrest * * * 'viewed from the standpoint of an objectively reasonable police

officer," amount to probable cause to support an arrest.  Maryland v. Pringle, 540 U.S. 366, 371 (2003), quoting Ornelas v. United States, 517 U.S. 690, 696 (1996).

Based upon the totality of the circumstances, we find that probable cause to arrest the Defendant existed prior to the time that he was apprehended at the Downwind residence.  As a result, we reject that basis for the Defendant's Motion to Suppress.

2.     The Consent to Search.

The Defendant next challenges his arrest, based upon his contention that Downwind's consent to search was not knowing and voluntary.  In this respect, we understand the Defendant to argue that Downwind's consent was not knowing and voluntary because Ybarra did not advise Downwind of his right to refuse consent, nor did she advise him of her intention to arrest the Defendant.

a.     Standard of Review.  The Fourth Amendment to the United States Constitution "generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects."  Illinois v. Rodriguez, 497 U.S. 177, 180 (1990), citing Payton v. New York, 445 U.S. 573 (1980); Johnson v. United States, 333 U.S. 10 (1948).  However, "'[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'"  United States v.

Pennington, 287 F.3d 739, 746 (8th Cir. 2002), cert. denied 537 U.S. 1022 (2002),

quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 420

U.S. 1170 (1997), citing Schneckloth v. Bustamonte, 412 U.S. 218, 218 (1973).  The

Government can "satisfy its burden of proving consent to a warrantless search by

showing 'permission to search was obtained from a third party * * * who possessed

common authority over * * * the premises' to be searched."   United States v.

Hudspeth, 518 F.3d 954, 957 (8th Cir. 2008), quoting United States v. Matlock, 415

U.S. 164, 171 (1974); see also, United States v. Hinkle, 456 F.3d 836, 840 (8th Cir.

2006)("A third party with 'common authority' over a property, or a third party that a

government agent reasonably believes has 'common authority' over a property, may

voluntarily consent to a search."), citing United States v. Janis, 387 F.3d 682, 686-87

(8th Cir. 2004).[5]

"Whether or not the consent was voluntary must be established by examining

the totality of the circumstances * * * ."   United States v. Bradley, 234 F.3d 363, 366

(8th Cir. 2000), citing United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990),

---

[5]We do not understand the Defendant to argue that Downwind was without authority to grant consent to search the residence, nor do we see, on this Record, how the Defendant could make any such claim.  Indeed, for these purposes, we assume, without deciding, that the Defendant had an expectation of privacy in the house owned by his girlfriend's father.

citing, in turn, Schneckoth v. Bustamonte, supra at 226. "We consider the following characteristics of the individual to determine whether their [sic] consent was truly voluntary: age, intelligence, intoxication, advice of Miranda rights, and previous arrests." United States v. Reinholz, 245 F.3d 765, 780 (8th Cir. 2001), citing United States v. Chaidez, supra at 381; see also, United States v. Urbina, 431 F.3d 305, 309 (8th Cir. 2005); United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002).

In addition to the characteristics of the consenting party, "[w]e also consider the following characteristics of the environment in which the individual's consent was given, so as to determine whether their [sic] consent was truly voluntary:  length of detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's contemporaneous objections and representations." United States v. Reinholz, supra at 780; see also, United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005)[en banc], cert. denied, 548 U.S. 903 (2006); United States v. Mendoza-Cepeda, 250 F.3d 626, 629 (8th Cir. 2001)(listing factors to be considered as to voluntariness of consent to search).

Ultimately, "[c]onsent is voluntary if it was '"the product of an essentially free and unconstrained choice by its maker,"' * * * rather than 'the product of duress or coercion, express or implied.'" United States v. Bradley, supra at 366, quoting United States v. Chaidez, supra at 380, quoting, in turn, Schneckloth v. Bustamonte, supra at 225, 227. "[T]he question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all circumstances." Schneckloth v. Bustamonte, supra at 227; see also, United States v. Fleck, 413 F.3d 883, 891-92 (8th Cir. 2005). The Government has the burden to show, by a preponderance of the evidence, that the consent was voluntary. See, United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005), citing United States v. Cedano-Medina, 366 F.3d 682, 684-85 (8th Cir. 2004); United States v. White, 81 F.3d 775, 780 (8th Cir. 1996).

     b.    Legal Analysis. Here, it is undisputed that law enforcement did not secure a Warrant to search Downwind's home. Rather, Ybarra testified that she obtained verbal consent from Downwind, and that Downwind provided her with a house key, in order to facilitate the search. The Defendant, in turn, argues that Downwind's consent was not knowing and voluntary, because he did not know that he could refuse consent, nor did he know that Ybarra planned to arrest the Defendant.

In determining whether an individual has expressed consent, "[t]he precise question is not whether [the individual] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he had consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001). "Consent can be inferred from words, gestures, and other conduct." Id., citing United States v. Mendoza-Cepeda, supra at 627. On this Record, we find that Downwind unequivocally expressed his consent to permit a search of his home, based upon Ybarra's testimony, which we find to be entirely credible.

Moreover, we find that Downwind acted in a manner which, objectively, would have provided a proper basis upon which law enforcement could reasonably infer that consent to search the home had been freely given. Ybarra asked Downwind if she could enter his home to get the Defendant, and -- in addition to providing verbal consent -- Downwind immediately handed over a house key, without any prompting from Ybarra. This action by Downwind was consistent with the provision of consent. See, e.g., United States v. White, 42 F.3d 457, 459-60 (8th Cir. 1994); United States v. Armstrong, 16 F.3d 289, 295 (8th Cir. 1994); United States v. Jamieson-McKames Pharmaceuticals, Inc., 651 F.2d 532, 542-43 (8th Cir. 1981), cert. denied, 455 U.S. 1016 (1982).

- 15 -

There is nothing in the Record to suggest that Downwind had any difficulty in speaking and understanding English, or that he was under the influence of any drugs or alcohol when he provided consent. Downwind's actions demonstrate that he understood Ybarra's request, and was capable of acceding to it, and facilitated the officer's access to his locked home, by granting the key to gain access.

We are mindful that Ybarra did not inform Downwind that he did not have to consent to the search of his home. However, there is no evidence that Downwind objected to Ybarra's presence at his home, or that he attempted to stop the officers when they began their search, or that he protested the Defendant's arrest. See, e.g., United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007); United States v. Va Lerie, supra at 710 ("The Supreme 'Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.'"), quoting United States v. Drayton, 536 U.S. 194, 206 (2002); United States v. Esquivias, supra at 701 ("While the officers did not inform [the defendant] of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his consent to be voluntary."), citing United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003); United States v. Alcantar, supra at 737 ("Although [the defendant] was not

advised of his right to refuse consent, that was not in and of itself sufficient to find that consent was not voluntarily given."), citing <u>United States v. Zapata</u>, 180 F.3d 1237, 1242 (11th Cir. 1999).

In sum, we find nothing in the Record which would support a conclusion that Downwind's verbal consent, or the consent implied by his behavior, was coercively obtained.   Compare, <u>United States v. Fleck</u>, supra at 892 ("[The defendant's] production of the bedroom key constituted further indicia of consent to search the bedroom."); <u>United States v. Williams</u>, 346 F.3d 796, 799 (8th Cir. 2003)("Further, consent reasonably implied from behavior suffices to trigger the exception [to the Warrant requirement];" and Court finds that resident holding door to apartment wide open and stepping aside was evidence of consent.); <u>United States v. Mendoza-Cepeda</u>, supra at 627-29 (defendant's gestures in handing bag to officer in response to officer's request to search bag; lifting boots in response to officer's request to search boots; and lifting arms in response to officer's request to search torso; were reflective of voluntary consent); <u>United States v. Jones</u>, supra at 695 (defendant's holding "arms out away from his body about ten to eighteen inches from his midsection, with his palms turned out," found to evidence consent to search torso); <u>United States v. Pollington</u>, 98 F.3d 341, 343 (8th Cir. 1996) ("Of special significance, we note that

[the defendant] offered to open the motor home's back door to facilitate [the trooper's] search."); United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994), cert. denied, 513 U.S. 911 (1994)("The district court properly inferred [the defendant's] consent from his testimony that facilitated the trooper's search of a cardboard box located in the trunk" and, "[i]n addition to [the defendant's] assistance during the search, the district court noted that [the defendant's] general demeanor suggested consent; he chatted with [the trooper], reminded the trooper of his work as a police officer, and acted friendly, not hostile.").

Given Downwind's voluntary consent for law enforcement to enter his home, we find that the Defendant's warrantless arrest was constitutionally permissible.[6] See, United States v. Chapman, 902 F.2d 1331, 1333 (8th Cir. 1990)(finding no constitutional violation where officers had third-party consent to enter home and search for the defendant), citing United States v. Purham, 725 F.2d 450, 455 (8th Cir.

---

[6]Moreover, we note that the Defendant was apprehended and arrested **outside** the home, which requires only probable cause. See, United States v. Pierson, 219 F.3d 803, 805 (8th Cir. 2000)("Once Pierson exited his room, the officers were entitled to arrest him without a warrant."), citing United States v. Wixom, 460 F.2d 206, 209 (8th Cir. 1972). Nonetheless, here, we find that Downwind's consent was voluntary and, as such, would have permitted the Defendant's warrantless arrest even inside the residence.

1984).  As a consequence, we recommend that the Defendant's Motion to Suppress Evidence, insofar as it relates to the seizure of his person, be denied.

    B.    <u>The Defendant's Motion to Suppress Statements</u>.

        With respect to his statement to Smith, the Defendant contends, first, that the statement was the fruit of his unlawful arrest.  Since we have concluded that his arrest was supported by probable cause, we reject any assertion that the statement was tainted.  The Defendant also argues that the statement must be suppressed, because he had previously invoked his right to counsel.  However, we conclude that the Defendant's statement was wholly spontaneous, and not the product of any custodial interrogation.  Accordingly, we find no basis upon which to suppress the Defendant's statement.

        1.    <u>Standard of Review</u>.  Government agents are not required to administer <u>Miranda</u> warnings to everyone they question.  See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).  Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985); <u>Berkemer v. McCarty</u>, 468 U.S. 420,

428-29 (1984).  Once a suspect is in police custody, and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning.  See, <u>Miranda v. Arizona</u>, supra at 473; see also, <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 804 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994); see also, <u>United States v. Ortiz</u>, 315 F.3d 873, 885 (8th Cir. 2002), cert. denied, 538 U.S. 1042 (2003).  Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." <u>Id.</u>, citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-376 (1979); see also, <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994); see also, <u>United State v. Valdez</u>, 146 F.3d 547, 551 (8th Cir. 1998), cert. denied, 525 U.S. 938 (1998)("Once an accused requests counsel, no further interrogation may take place until counsel has been made available or 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'"), quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights. See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987). However, "Miranda has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Indeed, our Court of Appeals has "'repeatedly held that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of Miranda warnings.'''" United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998), quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting, in turn, Rhode Island v. Innis, 446 U.S. 291, 299 (1980); United States v. Cunningham, 133 F.3d 1070, 1074 (8th Cir. 1998), cert. denied, 523 U.S. 1131 (1998)(where officers merely listen to suspect, nothing prohibits use of suspect's statements against him); United States v. Hayes, 120 F.3d 739, 744 (8th Cir.

1997)("'Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'"), quoting <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997), citing, in turn, <u>Butzin v. Wood</u>, 886 F.2d 1016, 1018 (8th Cir. 1989), cert. denied, 496 U.S. 909 (1990); <u>United States v. Kalter</u>, 5 F.3d 1166, 1168-69 (8th Cir. 1993)(<u>Miranda</u> does not require suppression of spontaneous utterances which are not the product of interrogation); <u>United States v. Waloke</u>, 962 F.2d 824, 828-29 (8th Cir. 1992) (suspect's spontaneous statements, while in transit to a detention center, were voluntary, were not the product of interrogation, and did not require the administration of a <u>Miranda</u> warning).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v. Bustamonte</u>, supra at 226.

As the Supreme Court has explained:

The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]   See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").   The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing."   Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, supra at 167; the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

2.    <u>Legal Analysis</u>.  Here, there is no dispute that, at the time of his arrest on May 20, 2008, the Defendant was in official custody.   The Record demonstrates that the Defendant was administered a <u>Miranda</u> warning by Ybarra, upon his arrival at the Detention Center, and that, thereafter, the Defendant immediately invoked his right to counsel.

However, the Record demonstrates, beyond cavil, that the statement that the Defendant made to Smith, while changing his clothes, was unsolicited, was spontaneous, and was not in response to any interrogation, or the functional equivalent of interrogation.   There is no evidence that either Ybarra, or Smith, spoke to the Defendant, while he was changing his clothes, or that they asked him any questions. In addition, neither officer had made reference to "swabbing" the Defendant for a DNA sample.   Accordingly, the statement, which was made by the Defendant while at the Detention Center, was not obtained in violation of <u>Miranda</u>.   See, <u>United States v. Hatten</u>, supra at 262 ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment, and is admissible with or without the giving of <u>Miranda</u> warnings.'"), quoting <u>Rhode Island v. Innis</u>, supra at 299; see also, <u>United States v. Cody</u>, 114 F.3d 772, 775 (8th

Cir. 1997)(finding spontaneous statements made after the invocation of the right to silence admissible).

Our conclusion is not impacted by Ybarra's testimony, that she smelled a strong odor of alcohol on the Defendant, at the time of his arrest.   While the personal characteristics of a suspect, such as his age, mental capacity, and intoxication, are pertinent to a determination of voluntariness, see, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 2005), coercive police conduct is a "necessary predicate" to finding a statement involuntary.    See, Colorado v. Connelly, supra at 167; Thatsaphone v. Weber, 137 F.3d 1041, 1046-1047 (8th Cir. 1998), cert. denied, 523 U.S. 1130 (1998).   Here, although Ybarra was aware that the Defendant might be under the influence of alcohol, the Defendant's intoxication, standing alone, would not render his response involuntary, at least on this Record.   See, United States v. Turner, supra at 555 (concluding that even if the defendant was intoxicated at the time of his confession, circumstances indicated that he was aware of his rights and made a knowing waiver); United States v. Makes Room, supra at 415 ("We have repeatedly declined to adopt a per se rule of involuntariness when confronted with intoxication and/or fatigue, and we decline to do so now.").   Instead, the test is whether the defendant's intoxication "caused the defendant's will to be overborne." United States

v. Annis, 446 F.3d 852, 856 (8th Cir. 2006), cert. denied, --- U.S. ---, 127 S.Ct. 3044 (2007), quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990), cert. denied, 499 U.S. 941 (1991).

Here, the Defendant has not presented any evidence of coercion, whether direct or indirect, that would otherwise demonstrate an overborne will. Moreover, there is no evidence that the Defendant's statement was made in response to any statement, or question, from either Smith or Ybarra. Further, whatever may have been the state of the Defendant's level of intoxication, he plainly understood the Miranda advisory, which had been provided to him, and had the mental capacity and understanding to invoke his right to silence. As a result, we conclude that the Defendant's statement to Smith was voluntary, and not the product of any interrogation. Accordingly, we recommend that the Defendant's Motion to Suppress Statement be denied in its entirety.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Motion of the Defendant Clinton James Donnell to Suppress Evidence Obtained Pursuant to Search and Seizure [Docket No. 26] be denied.

2.     That the Motion of the Defendant Clinton James Donnell to Suppress Statements [Docket No. 27] be denied.

Dated: July 21, 2008                    *s/Raymond L. Erickson*
                                        Raymond L. Erickson
                                        CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 7, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 7, 2008**, unless all interested

- 27 -

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.